IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Amy M. Rogers, a/k/a | ) | C/A No.: 1:13-2327-BHH-SVH |
| Amy M. King, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On December 3, 2010, Plaintiff protectively filed a claim for DIB, and on March 14, 2011, Plaintiff protectively filed a claim for SSI.  Tr. at 118–19, 120–29.  In both applications, she alleged her disability began on May 27, 2010.  *Id.*  Her applications were denied initially and upon reconsideration.  Tr. at 101–02, 108, 110.  On April 2, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") John S. Lamb.  Tr. at 60–92 (Hr'g Tr.).  The ALJ issued an unfavorable decision on June 21, 2012, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 8–44.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–6.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 27, 2013.  [Entry #1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 38 years old at the time of the hearing.  Tr. at 64.  She completed high school and obtained an associate's degree in nursing.  *Id.*  Her past relevant work ("PRW") was as a nurse, a medical assistant, and a phlebotomist.  Tr. at 86.  She alleges she has been unable to work since May 27, 2010.  Tr. at 118, 120.

2.     Medical History

Plaintiff underwent an MRI examination of her lumbar spine on February 8, 2010, which indicated no central canal or neuroforaminal narrowing, no focal disc protrusion or

extrusion, no high-intensity zone in the disks, no nerve-root displacement, and no evidence of facet synovitis.  Tr. at 417.

On February 19, 2010, Plaintiff presented to Anne Tuggle, M.D., with complaints of swelling in her bilateral feet and legs with pitting edema and left ankle tenderness.  Tr. at 322.  She indicated that she was experiencing fatigue, that she was having difficulty falling asleep, and that her hands were falling asleep when she wrote.  *Id.*  She also indicated that she was experiencing symptoms of depression and anxiety.  *Id.*  Dr. Tuggle observed bilateral 2–3+ pitting edema in Plaintiff's bilateral lower extremities that extended up to her knees.  Tr. at 323.  Dr. Tuggle prescribed Lasix.  *Id.*

Plaintiff presented to St. Francis Hospital Eastside on February 21, 2010, complaining of fatigue and fever.  Tr. at 256.  Musculoskeletal tenderness was noted on examination.  Tr. at 258.

On February 22, 2010, Plaintiff presented to Dr. Tuggle with complaints of profuse sweating, chills, body aches, and head pressure.  Tr. at 320.  Dr. Tuggle diagnosed a bacterial infection.  *Id.*

Plaintiff followed up with Dr. Tuggle on March 1, 2010, and reported body stiffness and achiness.  Tr. at 318.  Dr. Tuggle noted no abnormalities on examination, but assessed chronic pain syndrome and fibromyalgia.  Tr. at 318–19.

On March 15, 2010, Plaintiff presented to Dr. Tuggle with complaints of bilateral leg swelling and fatigue.  Tr. at 316.  Plaintiff's medications were refilled, but Plaintiff's Oxycodone dosage was decreased.  Tr. at 317.

Plaintiff presented to Dr. Tuggle on April 12, 2010, for follow up.  Tr. at 314.  She complained of bilateral leg edema.  *Id.*  Dr. Tuggle refilled her medications.  Tr. at 315.

On April 28, 2010, Plaintiff reported to Dr. Tuggle that she was not feeling well, had no energy, and had been placed on medical leave from work.  Tr. at 312.  Plaintiff complained of high stress, weakness, loss of appetite, fatigue, depression, anxiety, and constant sleepiness.  *Id.*

Plaintiff presented to Fady F. Nassif, M.D., on May 13, 2010, with a complaint of daytime sleepiness.  Tr. at 282.  She reported difficulty falling asleep, waking early and being unable to go back to sleep, and difficulty concentrating.  *Id.*  Dr. Nassif ordered a sleep study.  Tr. at 283.

On May 19, 2010, Plaintiff underwent a sleep study that revealed mild to moderate obstructive sleep apnea syndrome with significant sleep fragmentation and mild hypoxemia.  Tr. at 281.

Plaintiff presented to Dr. Tuggle on June 11, 2010, for follow up.  Tr. at 308.  She reported decreased stress since taking medical leave.  *Id.*  She indicated that she was experiencing lower back pain that was worse in the mornings.  *Id.*  Dr. Tuggle noted that Plaintiff appeared depressed and uncomfortable due to pain.  *Id.*

Plaintiff presented to Robert G. Schwartz, M.D., for initial evaluation on June 25, 2010.  Tr. at 381–82.  She complained of cervicothoracic pain and thoracolumbar pain, each involving corresponding limbs and associated with headaches.  Tr. at 381.  She indicated that she had experienced some symptoms since 2006, but that her symptoms had become more severe since February 2010.  *Id.*  She indicated that she experienced

4

weakness in her trunk and limbs and numbness in her hands and feet. *Id.* She indicated that she had trouble sleeping and that she was constantly fatigued. *Id.* She noted that her legs became discolored and swelled. *Id.* Dr. Schwartz noted the following abnormalities on examination: positive Phalen's sign bilaterally; marginally positive Spurling's sign to the right with spasm at C5-6 on the right; spasm in the right scalene; tenderness at each trapezius and at the T5-6 iliocostalis; painful arc at 120 degrees on the right with negative AC stress test; tenderness at biceps tendons, ECRL, and DCL; decreased lumbar lordosis; positive bilateral Bowstrings and straight leg raise tests; tenderness at L5-S1 and T12; 1+ pretibial edema with decreased peripheral pulses; and tenderness at the bilateral MCLs and sinus tarsi. Tr. at 381–82. Dr. Schwartz indicated that Plaintiff had fibromyalgia with possible bilateral carpal tunnel syndrome. Tr. at 382.

Plaintiff followed up with Dr. Nassif on June 30, 2010. Tr. at 285–86. Dr. Nassif ordered CPAP titration and refilled Plaintiff's prescription for Provigil. *Id.*

Plaintiff presented to St. Francis Hospital Eastside on July 7, 2010, and underwent Biodex testing. Tr. at 264. The results of the study were inconsistent. *Id.* An x-ray of Plaintiff's cervical spine on July 7, 2010, indicated a congenital fusion at C3-4 with neural foraminal narrowing. Tr. at 271. Plaintiff also had extensive lab tests that indicated no significant abnormalities. Tr. at 268–70.

Plaintiff followed up with Dr. Tuggle on July 12, 2010, with complaints of myalgia, joint pain, depression, and anxiety. Tr. at 305. Dr. Tuggle noted no abnormalities on examination. Tr. at 305–06.

5

An electromyography ("EMG") administered on July 13, 2010, indicated bilateral L5 nerve root irritation, borderline lower extremity sensory peripheral neuropathy, and bilateral carpal tunnel syndrome.  Tr. at 377.  Dr. Schwartz administered lumbar transforaminal and paravertebral injections.  *Id.*

A diagnostic musculoskeletal ultrasound on July 21, 2010, indicated evidence of hypoechogenicity at C4-6, T2-3, and T5-6, with lesser changes in Plaintiff's posterior shoulder capsule.  Tr. at 375.  Plaintiff complained of increased joint pain, increased headaches, toe discoloration, and leg swelling.  *Id.*  Dr. Schwartz administered an epidural steroid injection.  *Id.*

On August 1, 2010, Plaintiff complained to her psychiatrist, Peter L. Owens, M.D., that she was experiencing increased depression, chronic pain, poor sleep, and fatigue.  Tr. at 505.

On August 2, 2010, Dr. Schwartz indicated that the venous duplex study indicated mild reflux, right greater than left, in Plaintiff's bilateral popliteal veins.  Tr. at 373.  He administered cervical transforaminal and paravertebral injections.  *Id.*

On August 10, 2010, Dr. Schwartz indicated that he did not anticipate Plaintiff would be able to return to work soon and that he was sending her for a functional capacity evaluation.  Tr. at 371.  He indicated that Plaintiff had fibromyalgia in the presence of C3-4 fusion; cervical degenerative disk disease; bilateral S1 nerve irritation; sensory peripheral neuropathy; bilateral carpal tunnel syndrome; cervical, thoracic, and right posterior shoulder capsule ligamentous strain; bilateral lower extremity venous

reflux; and a history of depression and anxiety. *Id.* He administered thoracic transforaminal and paravertebral injections. *Id.*

On August 17, 2010, Dr. Schwartz administered cervical transforaminal and paravertebral injections. Tr. at 367.

Plaintiff complained of increased shoulder pain, blurred vision, and increased panic and anxiety on August 27, 2010. *Id.* Dr. Schwartz administered thoracic transforaminal and paravertebral injections. *Id.*

Dr. Schwartz performed a vascular Doppler duplex ultrasound examination on September 1, 2010 that yielded normal results. Tr. at 366.

On September 14, 2010, Plaintiff presented to Dr. Tuggle with multiple complaints. Tr. at 301. Plaintiff indicated that she had low energy, depressed mood, and high stress. *Id.* She said that she was experiencing shortness of breath, weight gain, joint stiffness, and joint pain. *Id.* Dr. Tuggle observed bilateral trace pitting edema, left greater than right. Tr. at 302.

Plaintiff followed up with Dr. Schwartz on September 15, 2010, and he noted that Plaintiff had seen Dr. Cain and completed a three-dimensional lift assessment. Tr. at 364. Dr. Schwartz noted that Plaintiff only lifted five pounds, but that he would restrict her lifting to 20 pounds. *Id.* Dr. Schwartz administered thoracic transforaminal and paravertebral injections. *Id.*

On September 23, 2010, Dr. Schwartz noted that Plaintiff's cranial MRI was normal. Tr. at 363. Plaintiff indicated that she had experienced some improvement in

her pain, but that her thoracolumbar pain was still bothersome. *Id.* Dr. Schwartz administered lumbar transforaminal and paravertebral injections. *Id.*

Plaintiff followed up with Dr. Tuggle on September 27, 2010, to report that her prescriptions were stolen and that she was in a lot of pain. Tr. at 298. She indicated that she was experiencing shortness of breath, weight gain, joint stiffness, and joint pain. *Id.* Dr. Tuggle noted that Plaintiff had bilateral trace pitting edema, left greater than right. Tr. at 299.

On October 15, 2010, Dr. Schwartz noted that Plaintiff had 1–2+ edema. Tr. at 358. Plaintiff indicated that her mid-back was improved, but that she was still experiencing pain in her low back. *Id.* Dr. Schwartz administered lumbar transforaminal and paravertebral injections. *Id.*

Plaintiff saw Dr. Owens on October 17, 2010. Tr. at 504. She reported that she was experiencing chronic pain. *Id.* She also complained of depression and weight gain. *Id.*

On October 18, 2010, Dr. Schwartz performed a vascular Doppler duplex ultrasound that indicated reflux within the right common femoral vein. Tr. at 357.

Dr. Schwartz administered lumbar transforaminal and paravertebral injections on November 1, 2010. Tr. at 356.

On November 2, 2010, Plaintiff reported to Dr. Nassif that she was experiencing dyspnea on exertion and lower extremity edema. Tr. at 289. Dr. Nassif ordered lab tests and a pulmonary stress test. Tr. at 290.

Dr. Schwartz administered upper body sympathetic galvanic skin response testing on November 2, 2010.   Tr. at 355.   The testing indicated a possible sympathetic dysfunction in the dorsal and radial aspect of the arm and forearm.   *Id.*   Dr. Schwartz administered an epidural steroid injection.   *Id.*

On November 15, 2010, Plaintiff complained to Dr. Tuggle that she was having difficulty urinating.   Tr. at  296.   She complained of joint pain and stiffness.   *Id.*   Dr. Tuggle noted 2–3+ bilateral edema.   Tr. at 297.   She indicated that Plaintiff had reflex sympathetic dystrophy ("RSD") and increased her Lyrica prescription.   *Id.*

Plaintiff complained of neck pain on November 23, 2010.   Tr. at 356.   Dr. Schwartz administered an electric stellate ganglion block.   *Id.*

On December 3, 2010, Dr. Schwartz administered another electric stellate ganglion block.   *Id.*

Plaintiff presented to Mark D. Call, M.D., on December 9, 2010, for an infectious disease consultation.   Tr. at 429–31.   Dr. Call referred her for a battery of lab tests.   Tr. at 431.

Plaintiff followed up with Dr. Schwartz on December 17, 2010, and reported more back pain and bilateral lower extremity pain.   Tr. at 353.   Dr. Schwartz noted that Plaintiff was sedentary and had gained 30 pounds.   *Id.*   Plaintiff's reflexes were symmetric; her motor strength was 5/5; her sensation was intact; her heel and toe walking were normal; her range of motion was full; and her straight-leg raise, Bragard's, Fabere's, and SI stretch tests were negative.   *Id.*   However, Plaintiff demonstrated a decrease in lumbar lordosis with paraspinal spasm; positive Bowstring and reverse straight-leg raise

tests; and spasm with tenderness in the L5-S1 facets and SI joints bilaterally. *Id.* Dr. Schwartz administered an SI joint region injection. *Id.*

Plaintiff followed up with Dr. Tuggle on January 13, 2011, with complaints of low energy, depressed mood, and feeling overwhelmed. Tr. at 294. She indicated that she was experiencing joint pain and stiffness. *Id.* Dr. Tuggle increased Plaintiff's Lyrica and Lasix dosages. Tr. at 295.

Plaintiff followed up with Dr. Schwartz on January 14, 2011, and reported that she had to discontinue use of a pain patch due to skin irritation. Tr. at 353. Plaintiff complained of low back pain. *Id.* Dr. Schwartz administered an SI joint region injection. *Id.*

Plaintiff followed up with Dr. Call's associate, Teresa A. Bowers, M.D., on January 18, 2011. Tr. at 433–35. She complained of fatigue, myalgia, joint pain, and headache. Tr. at 433. Dr. Bowers indicated that the Lyme antibody was positive, but that further lab work for Lyme disease was negative. Tr. at 435. Dr. Bowers further indicated that there was no sign of any active infection. *Id.*

On January 27, 2011, Plaintiff reported to Dr. Schwartz that she received excellent relief after her last visit and was almost pain-free for over a week. Tr. at 352. Dr. Schwartz administered an SI joint injection. *Id.*

While the date is difficult to interpret, it appears that Plaintiff saw Dr. Owens on January 31, 2011. Tr. at 503. She complained of weight gain and increased pain, but most of the notes from this visit are illegible. *Id.*

On February 7, 2011, Plaintiff reported to Dr. Schwartz that her low back was 50 percent better.  Tr. at 352.  She complained of continued burning and stinging in her thoracolumbar area.  *Id.*  Dr. Schwartz administered an SI joint injection.  *Id.*

Plaintiff was referred to Spurgeon N. Cole, Ph.D., for a consultative examination on February 17, 2011.  Tr. at 326–28.  Plaintiff indicated that she slept for six to seven hours per night, that her appetite was poor, that her energy level was decreased, but  that she had no thoughts of self-harm.  Tr. at 327.  Dr. Cole noted that Plaintiff concentrated adequately, stayed on task, and remembered two of three items after interference.  *Id.*  Dr. Cole indicated the following with respect to Plaintiff's abilities:

> She is capable of concentrating well enough to complete the task in a timely manner.  From a psychological standpoint her pace and persistence wou[l]d be satisfactory, although she is limited by her physical difficulties.  She relates satisfactorily to others and would have no difficulty interacting with co-workers and supervisors.  She is capable of learning simple and relatively complex tasks.  She can handle funds.

*Id.*  Dr. Cole indicated a diagnostic impression of depression.  Tr. at 328.

Dr. Schwartz administered sympathetic galvanic skin response studies on February 21, 2011.  Tr. at 351.  The testing indicated an asymmetry pattern in the lateral aspect of the thigh and anterior, distal leg.  *Id.*  The results indicated that sympathetic dysfunction should be considered.  *Id.*  Dr. Schwartz administered a sciatic nerve block.  *Id.*

On March 2, 2011, state agency psychological consultant Lisa Klohn, Ph.D., completed a psychiatric review technique in which she indicated that Plaintiff had been diagnosed with major depressive disorder; that she had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties

in maintaining concentration, persistence, or pace.  Tr. at 331–43.  Dr. Klohn completed a

mental residual functional capacity assessment in which she indicated that Plaintiff was

moderately limited with respect to the following: the ability to maintain attention and

concentration for extended periods; the ability to perform activities within a schedule,

maintain regular attendance, and be punctual within customary tolerances; and the ability

to complete a normal workday and workweek without interruptions from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and

length of rest periods.  Tr. at 345–46.  Dr. Klohn noted the following regarding Plaintiff's

residual functional capacity:

> Due to depression . . . this claimant might have difficulty with complex
> tasks, but she should be able to attend to and perform simple unskilled work
> for reasonable periods of time without special supervision.  She can attend
> work regularly, but might miss an occasional day due to her mental illness.
> She can make work-related decisions, protect herself from work-related
> safety hazards and travel to and from work independently.  She can accept
> supervision and interact appropriately with co-workers, and work with the
> general public.

Tr. at 347.

Plaintiff followed up with Dr. Nassif on March 3, 2011, and complained of

dyspnea on exertion and lower extremity edema.  Tr. at 384.  Plaintiff indicated that she

was more alert and that she was waking refreshed.  *Id.*

On March 7, 2011, Plaintiff reported to Dr. Schwartz that her back and leg pain

had decreased significantly.  Tr. at 349.  Dr. Schwartz noted that Plaintiff still had 3+

pitting edema, and he advised her to wear the compression stockings more often.  *Id.*  Dr.

Schwartz also noted that Plaintiff was tender over the axillary nerve in her right shoulder. *Id.* Dr. Schwartz administered an ultrasound guided axillary nerve block. *Id.*

Plaintiff followed up with Dr. Tuggle on March 16, 2011. Tr. at 463. She complained of leg edema, fatigue, high stress, low energy, depressed mood, and feeling overwhelmed. *Id.* Dr. Tuggle noted no abnormalities on examination. Tr. at 463–64.

On March 21, 2011, Dr. Schwartz noted that venous duplex indicated reflux in the left popliteal vein. Tr. at 349. Plaintiff indicated that her right shoulder was 50 percent better. *Id.* Dr. Schwartz administered an ultrasound guided axillary nerve block. *Id.*

Plaintiff followed up with Dr. Schwartz on April 4, 2011, and reported 50 percent improvement in her shoulder. Tr. at 499. While Plaintiff complained of reduced movement in her left shoulder, Dr. Schwartz indicated that range of motion was full, but that Plaintiff had tender points in her posterior shoulder capsule, in her levator scapulae, and over her supraspinatus notch. *Id.* He administered an axillary nerve block. *Id.*

On April 6, 2011, a diagnostic musculoskeletal ultrasound indicated evidence of hypoechogenicity at Plaintiff's posterior shoulder capsule with irregularity or discontinuity in her AC joint. Tr. at 498. Dr. Schwartz administered a suprascapular nerve block and an AC ligament injection. *Id.*

On April 13, 2011, Plaintiff was referred for a consultative examination with Stuart M. Barnes, M.D. Tr. at 390–92. Dr. Barnes noted that Plaintiff's affect was flat and that she appeared depressed. Tr. at 391. He observed mild crepitus in Plaintiff's bilateral knees and 1–2+ edema in both pretibial areas. Tr. at 392. Plaintiff demonstrated

13

no spinal tenderness on palpation and had normal range of motion of her spine. *Id.* All other testing was normal. *Id.*

State agency medical consultant Adrian Corlette, M.D., completed a physical residual functional capacity assessment on April 20, 2011, in which he indicated that Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull unlimited; occasionally climb ramps/stairs/ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, hazards, etc. Tr. at 398–405.

Plaintiff reported improvement in her shoulder on April 25, 2011, but noted that her low back pain had flared. Tr. at 497. Dr. Schwartz observed tenderness in Plaintiff's left SI joint. *Id.* He administered an SI joint region injection. *Id.*

On May 12, 2011, Plaintiff indicated that her depression had worsened since Dr. Owens switched her medication from Cymbalta to Zoloft. Tr. at 497. Plaintiff reported improvement in her low back pain, but complained of increased pain in her left shoulder. *Id.* Dr. Schwartz noted tenderness in the left shoulder. *Id.* He administered a suprascapular nerve block and an AC ligament injection. *Id.*

Plaintiff presented to Dr. Nassif on May 16, 2011, with complaints of dyspnea and sharp pain with cough. Tr. at 479. Dr. Nassif noted 2+ edema in Plaintiff's lower extremities. *Id.*

14

On June 2, 2011, Dr. Schwartz noted that Plaintiff's psychiatrist was manipulating her medications and that "it isn't going too well." Tr. at 497. Plaintiff reported increased low back pain. *Id.* Dr. Schwartz noted tenderness at Plaintiff's bilateral SI joints. *Id.* He administered an SI joint region injection. *Id.*

On June 8, 2011, Plaintiff reported to Dr. Nassif that she was experiencing dyspnea, sleepiness, and persistent lower extremity edema. Tr. at 477. Dr. Nassif noted 1+ edema in Plaintiff's lower extremities. *Id.*

On June 10, 2011, Dr. Schwartz noted that Plaintiff was depressed. Tr. at 496. He administered a suprascapular nerve block and an AC ligament injection. *Id.*

Plaintiff followed up with Dr. Tuggle on June 15, 2011. Tr. at 456. She complained of shortness of breath, leg edema, sleep disturbance, low energy, depressed mood, and feeling overwhelmed. *Id.* Dr. Tuggle observed no abnormalities on examination. Tr. at 457.

Dr. Schwartz noted that Plaintiff's pain and depression were improving on June 24, 2011. Tr. at 496. He administered an SI joint region injection. *Id.*

Plaintiff also saw Dr. Owens on June 24, 2011, but the notes from this visit are generally illegible. Tr. at 502.

On July 7, 2011, Plaintiff presented to Dr. Nassif's associate, John Kulak, D.O., with a complaint of excessive edema. Tr. at 471. Dr. Kulak indicated that Plaintiff had 2–3+ edema in her lower extremities. *Id.* He increased Plaintiff's Lasix dosage. *Id.*

Plaintiff reported to Dr. Schwartz on July 18, 2011, that the previous SI joint injection had helped, but that her symptoms had recurred approximately one week prior to her visit.  Tr. at 496.  Dr. Schwartz administered an SI joint region injection.  *Id.*

On August 1, 2011, Plaintiff reported to Dr. Schwartz that she was more depressed.  Tr. at 496.  He administered a sacral ligament injection.  *Id.*

On September 1, 2011, Dr. Owens indicated that Plaintiff felt "pretty at peace." Tr. at 501.  Dr. Owens refilled Plaintiff's medications.  *Id.*

Plaintiff presented to Dr. Tuggle for a three-month follow up on September 14, 2011.  Tr. at 452.  She complained of abdominal pain, constipation, fatigue, myalgia, joint pains, high stress, sleep disturbance, weight gain, sadness, shortness of breath with exertion, weakness, and leg edema.  *Id.*  Dr. Tuggle noted no abnormalities on examination.  Tr. at 453.

On September 19, 2011, Plaintiff indicated that she was experiencing increased pain.  Tr. at 495.  Dr. Schwartz noted tenderness at Plaintiff's midsacral ligaments and at the sacrotuberous ligaments bilaterally.  *Id.*  Dr. Schwartz administered a sacrotuberous ligament injection.  *Id.*

Plaintiff followed up with Dr. Schwartz on October 3, 2011, and requested a handicapped parking permit.  *Id.*  Dr. Schwartz declined to authorize for Plaintiff to receive the permit.  *Id.*  Dr. Schwartz noted tenderness at Plaintiff's SI joints bilaterally. *Id.*  He also noted that Plaintiff had gained 80 pounds.  *Id.*  He administered an SI joint region injection.  *Id.*

On October 24, 2011, Plaintiff complained to Dr. Owens that she was depressed, was having problems sleeping, and had no money.  Tr. at 501.  Additional notes from this visit are illegible.  *Id.*

Plaintiff presented to Dr. Schwartz on October 24, 2011, and reported that her low back pain was improved, but that her mid-back pain had worsened.  Tr. at 494.  She described a burning sensation in her mid-back and feet.  *Id.* Dr. Schwartz noted intercostal tenderness at T10–12.  *Id.*  He administered intercostal regional and thoracic paravertebral nerve blocks.  *Id.*

On November 9, 2011, Plaintiff indicated to Dr. Schwartz that her intercostal pain was 75 percent better and that her low back pain had improved, but continued to bother her.  *Id.*  Dr. Schwartz indicated that Plaintiff was tender at L2-3, L3-4, and at the left SI joint.  *Id.*  He administered SI joint region and lumbar facet region injections.  *Id.*

On November 10, 2011, Plaintiff complained to Dr. Nassif that she was experiencing dyspnea with exertion and persistent lower extremity edema.  Tr. at 468. Dr. Nassif noted no abnormalities on examination.  *Id.*

On November 21, 2011, Plaintiff complained to Dr. Schwartz of recurring intercostal and rib pain.  Tr. at 493.  Dr. Schwartz noted tenderness to palpation.  *Id.*  He administered intercostal regional and thoracic paravertebral nerve blocks.  *Id.*

On December 12, 2011, Plaintiff indicated some improvement in her mid-back pain.  *Id.*  Dr. Schwartz observed tenderness in Plaintiff's sacral triangle and performed middle cluneal peripheral neurolysis.  *Id.*

Plaintiff followed up with Dr. Tuggle on December 14, 2011.  Tr. at 448.  She complained of shortness of breath, leg edema, constipation, epigastric pain, joint stiffness, joint pain, joint swelling, depression, sleep disturbance, and anxiety.  *Id.*  Dr. Tuggle noted no abnormalities on examination.  Tr. at 449.

On December 20, 2011, Plaintiff complained of frontal and temporal headaches.  Tr. at 493.  Dr. Schwartz noted tenderness and administered a superior cervical sympathetic ganglion block.  *Id.*

On January 3, 2012, Plaintiff indicated to Dr. Schwartz that her headaches had improved, but that she still had significant low back pain.  Tr. at 492.  Dr. Schwartz noted tenderness and performed superior cluneal neurolysis.  *Id.*

Plaintiff visited Dr. Owens on January 18, 2012.  Tr. at 500.  The notes from this visit are illegible.

Plaintiff presented to Dr. Schwartz on January 24, 2012, with neck pain radiating into her bilateral shoulders.  Tr. at 492.  Dr. Schwartz administered spinal accessory and paravertebral nerve blocks.  *Id.*

Plaintiff followed up with Dr. Tuggle on January 25, 2012, for depression, asthma, and chronic back pain.  Tr. at 445–47.  She indicated that she was experiencing leg edema, shortness of breath, abdominal pain, constipation, joint pain, joint swelling, depression, anxiety, and sleep disturbance.  Tr. at 445.  However, Dr. Tuggle noted no abnormalities upon examination.  Tr. at 446.

On February 14, 2012, Plaintiff followed up with Dr. Schwartz.  Tr. at 492.  She indicated that her neck pain had improved, but she complained of low back pain.  *Id.*  Dr.

Schwartz administered a sacral ligament injection. *Id.* Dr. Schwartz wrote a note in which he indicated that Plaintiff remained unemployable. Tr. at 491.

Plaintiff followed up with Dr. Owens on February 16, 2012. Tr. at 500. The notes from this visit are illegible. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on April 2, 2012, Plaintiff testified that fibromyalgia was her most severe impairment. Tr. at 66. She indicated that she was diagnosed with fibromyalgia around February 2010, but that she was placed on medical leave from work on May 27, 2010. *Id.* Plaintiff testified that she saw Dr. Schwartz every two weeks and that she received steroid and saline injections at each visit. *Id.*

Plaintiff testified that she sometimes experienced nerve inflammation in her left foot that interfered with her ability to walk and for which Dr. Schwartz administered nerve blocks. Tr. at 67.

Plaintiff testified that she had pain caused by degenerative disc disease and peripheral vascular disease. *Id.* Plaintiff indicated that she had neuropathy in her bilateral legs and feet. Tr. at 69.

Plaintiff testified that she had COPD, but she indicated that she continued to smoke. *Id.* She stated that she had sleep apnea and that she slept with a CPAP machine. Tr. at 72. Plaintiff testified that she had bilateral carpal tunnel syndrome, but that surgery had not been advised. Tr. at 73.

Plaintiff testified that she had depression and anxiety that were being treated with medication and psychiatric treatment.  Tr. at 76–77.  Plaintiff indicated that she had problems with fatigue, lethargy, and relationships with others.  Tr. at 77.

Plaintiff testified that she was living in a home with her sister, with whom she shared household chores.  Tr. at 78

Plaintiff testified that she had a driver's license and that she drove, including short trips to the grocery store.  *Id.*

Plaintiff testified that she could sit for 20 to 30 minutes, lift no more than five pounds, and walk for five to ten minutes at a time.  Tr. at 78–79.

Plaintiff testified that she could combine sitting, standing, and walking for three to four hours at a time, but that she needed to lie down three to four times a day for 45 minutes each time.  *Id.*

Plaintiff testified that she had difficulty reaching and had lost grip strength.  Tr. at 80–81.  Plaintiff testified that she could use her hands for five to ten minutes, but that using her hands caused them to become numb and to tingle.    Tr. at 81.

Plaintiff testified that her pain was typically a seven or eight out of ten, but that it was sometimes less and sometimes ten.  Tr. at 82.  Plaintiff indicated that she had problems with concentration and memory, problems with social interaction, and she avoided being around other people.  Tr. at 82–83.

Plaintiff testified that her medications made her sleepy.  Tr. at 84.  Plaintiff indicated that she had gained 72 pounds since her illness began.  *Id.*

b.      Vocational Expert Testimony

Vocational Expert ("VE") Carl Weldon reviewed the record and testified at the hearing. Tr. at 85–92. The VE categorized Plaintiff's PRW as a registered nurse as light and skilled with an SVP of 6; as a phlebotomist as light, per the Dictionary of Occupational Titles ("DOT") and medium as performed, with an SVP of 3, which is semi-skilled; and as a medical assistant as light and semi-skilled with an SVP of 3. Tr. at 86. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could occasionally climb ramps or stairs; could never use ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, or crawl; must avoid concentrated exposure to fumes, odors, dusts, gases, or pulmonary irritants; and must avoid concentrated exposure to hazards. Tr. at 87. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a medical assistant and a nurse. *Id.* The ALJ added additional restrictions of simple, routine, repetitive tasks with no ongoing public contact in a low stress environment that involved only occasional changes in a work setting or in decision making. *Id.* The ALJ asked whether the hypothetical individual could perform Plaintiff's PRW. *Id.* The VE testified that the individual could not. Tr. at 88. The ALJ then asked if there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light and unskilled jobs as an office helper, DOT number 239.567-010, with 900 jobs in the upstate area and 196,000 jobs nationally; a cashier, DOT number 211.462-010, with 1,00 jobs in the upstate area and 245,000 jobs nationally; and a sales attendant, DOT number 299.677-010, with 5,000 jobs in the upstate area and 4,000,000 jobs nationally. *Id.* The ALJ changed the first hypothetical to consider an individual limited to the

21

sedentary exertional level who could occasionally climb ramps or stairs; never use ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to fumes, odors, dusts, gases, and pulmonary irritants; and must avoid concentrated exposure to hazards.  Tr. at 89.  The VE indicated that the hypothetical individual could not perform Plaintiff's PRW.  *Id.*  The ALJ asked if the individual could perform other work that utilized transferable skills from Plaintiff's PRW.  *Id.*  The VE indicated that the individual could perform jobs as an admission's clerk, DOT number 205.362-018, with 2,500 jobs in South Carolina and 224,000 jobs in the national economy and as a medical clerk, DOT number 205.567-010, with 2,800 jobs in South Carolina and 164,000 jobs nationally.  *Id.*  The VE identified Plaintiff's transferable skills as a general understanding of the medical field, hospital procedure, medical words, procedures, and diagnoses; the ability to take temperature, pulse, and respiration; and the ability to keep records.  Tr. at 90.  The ALJ added additional restrictions to the sedentary hypothetical, limiting the individual to simple, routine, and repetitive tasks with no ongoing public contact in a low stress work setting.  *Id.*  The VE identified jobs as an order clerk, DOT number 209.567-014, with 1,600 jobs in the upstate area and 255,000 jobs nationally; an information clerk, DOT number 237.367-046, with 1,000 jobs in the upstate area and 1,000,000 jobs nationally; and an inspector, DOT number 726.684-050, with 900 jobs in the upstate and 210,000 jobs nationally.  Tr. at 91.  Finally, the ALJ asked the VE to assume that the individual had a combination of impairments that prevented her from maintaining concentration, persistence, or pace required to engage in work activity on a regular and sustained basis.  *Id.*  The VE

indicated that the hypothetical individual would be incapable of any type of productive work activity.  *Id.*

Plaintiff's attorney declined to question the VE.  Tr. at 92.

### 2.    The ALJ's Findings

In his decision dated June 21, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
2.    The claimant has not engaged in substantial gainful activity since May 27, 2010, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*, and § 416.971 *et seq.*).
3.    The claimant has the following combination of medically determinable severe impairments: fibromyalgia, cervical degenerative disk disease, peripheral vascular disease with neuropathy, morbid obesity, sleep apnea, depression, and anxiety (20 C.F.R. § 404.1520(c) and § 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).
5.    After careful consideration of the entire record, I finding that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except that because of her fibromyalgia she can never climb ladders, ropes, or scaffolds, but can occasionally use ramps, balance, stoop, kneel, crouch, or crawl.  Because of COPD she must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, or pulmonary irritants.  Because of her medications, she must avoid concentrated exposure to hazards.  Because of her mental impairments, she is limited to simple, routine, repetitive tasks, in an environment with only occasional changes.
6.    The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565 and § 416.965).
7.    The claimant was born on April 15, 1973 and was 37 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 C.F.R. § 404.1563 and § 416.963).
8.    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564 and § 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 27, 2010, through the date of this decision (20 C.F.R. § 404.1520(g) and 416.920(g)).

Tr. at 13–44.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  The ALJ failed to consider the combined effects of Plaintiff's impairments;

2)  The ALJ failed to assign controlling weight to the opinions of her treating physicians;

3)  The ALJ failed to make an adequate finding regarding Plaintiff's credibility; and

4)  The Appeals Council failed to consider evidence from Dr. Schwartz dated January 21, 2013 and February 8, 2013.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.  Legal Framework

1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g).

The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Combined Effect of Plaintiff's Impairments

Plaintiff argues that the ALJ ignored the combined effects of all of her impairments.  [Entry #23 at 7].

27

The Commissioner argues that the ALJ made sufficient findings regarding the combination of Plaintiff's impairments. [Entry #24 at 7]. The Commissioner submits that the ALJ provided a detailed consideration of each of Plaintiff's impairments, that he relied on opinions that considered all of Plaintiff's impairments, and that he set forth a RFC that tied specific limitations to specific impairments.

When a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

The ALJ separately discussed each of Plaintiff's impairments at length in his 34-page decision. *See* Tr. at 13–31. In each of these separate discussions, he set forth Plaintiff's testimony regarding the problem and provided a summary of her treatment history, which included her complaints, treatment received, and objective findings. *Id.*

28

He also indicated that he considered the Listings with respect to obesity (based on the directive of SSR 02-1p), depression and anxiety, and disorders of the spine. Tr. at 23, 30, 31–32. He then limited Plaintiff to light work and indicated the following regarding additional restrictions:

> [B]ecause of her fibromyalgia she can never climb ladders, ropes, or scaffolds, but can occasionally use ramps, balance, stoop, kneel, crouch, or crawl. Because of COPD, she must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, or pulmonary irritants. Because of her medications, she must avoid concentrated exposure to hazards. Because of her mental impairment, she is limited to simple, routine, repetitive tasks, in an environment with only occasional changes.

Tr. at 36.

The undersigned recommends a finding that the ALJ failed to adequately explain his consideration of the combined effect of Plaintiff's impairments. In *Walker*, the ALJ engaged in an analysis similar to that of the ALJ in this case. Like this ALJ, "[a]fter finding that clamant failed to meet a listing, the ALJ went on to discuss each of claimant's impairments but failed to analyze the cumulative effect the impairments had on the claimant's ability to work." *Walker*, 889 F.2d at 49. "He simply noted the effect or noneffect of each and found that the claimant could perform light and sedentary work." *Id.* Here, the ALJ discussed Plaintiff's impairments that included fibromyalgia, degenerative disc disease, peripheral vascular disease, bilateral carpal tunnel syndrome, morbid obesity, sleep apnea, chronic obstructive pulmonary disease (COPD), neurotic excoriation versus RSD, and depression and anxiety with a panic disorder. *See* Tr. at 13–31. He concluded that fibromyalgia, degenerative disc disease, peripheral vascular disease with neuropathy, morbid obesity, sleep apnea, depression and anxiety were severe

impairments.  Tr. at 13.  Then, he indicated that Plaintiff had been diagnosed with fibromyalgia and degenerative disc disease, but that her pain "does not cause her to be unable to perform a wide range of light work."  Tr. at 36.  He set forth a RFC that limited Plaintiff to light work and provided specific limitations with regard to fibromyalgia, COPD, medications, and mental impairment.  *Id.*  The ALJ did not discuss how Plaintiff's combined impairments affected her ability to work.  Furthermore, he did not indicate that he imposed any restrictions based upon three of what he determined to be Plaintiff's severe impairments—peripheral vascular disease with neuropathy, morbid obesity, and sleep apnea.  Therefore, based on the Fourth Circuit's rationale in *Walker* and this court's rationale in *Saxon*, the undersigned recommends a finding that the ALJ erred.

The Commissioner argues that the ALJ's rationale is similar to that used in cases affirmed by this court, including *Simmons v. Astrue*, No. 9:11-2729-CMC-BM, 2013 WL 530471, at *5 n.7 (D.S.C. Feb. 11, 2013), and *Brown v. Astrue*, No. 0:10-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012).  The Commissioner argues that these cases indicate that the decision must be read as a whole in order to determine whether the ALJ considered the combined effects of the impairment.  However, the instant case is distinguishable from *Simmons* and *Brown* in that a reading of the decision as a whole does not reveal that the ALJ considered how Plaintiff's combination of impairments affected her ability to engage in sustained work activity.  It is also distinguishable in that the ALJs in *Simmons* and *Brown* indicated restrictions pertaining to each of the severe impairments and then specifically indicated that they considered all of the effects of the

plaintiffs' impairments together.    This ALJ failed to provide such an indication. Therefore, the rationale in *Simmons* and *Brown* does not direct that this case be affirmed.

### 2.    Controlling Weight to Treating Physicians' Opinions

Plaintiff argues that the ALJ erred in failing to accord controlling weight to the opinions of her treating physicians.  [Entry #23 at 7].  Plaintiff further argues that there was no persuasive evidence that was contradictory to the opinions of her treating physicians.  [Entry #23 at 9].

The Commissioner argues that the ALJ fully considered each of the opinions and explained the weight he gave them and the reasons for according that weight.  [Entry #24 at 9].  The Commissioner submits that the ALJ provided specific reasons for giving little weight to Dr. Owens's opinion.  [Entry #24 at 11].  The Commissioner argues that the ALJ also provided an explanation for his decision to give little weight to Dr. Schwartz's opinion.  [Entry #24 at 11–12].  The Commissioner argues that Dr. Tuggle's statement is an opinion on an issue reserved to the Commissioner, but that the ALJ weighed it and provided an explanation for the weight he gave it.  [Entry #24 at 12–13].

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record).  However, "the rule does not require that the testimony be given controlling weight."  *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir.

1992) (per curiam); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001).

"Opinions that you are disabled" are among those reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). "Opinions on some issues . . . are not medical opinions, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." *Thompson v. Astrue*, 442 Fed. Appx. 804, 808 (4th Cir. 2011) *quoting* 20 C.F.R. §§ 404.1527(e), 416.927(e). Such opinions are not afforded any special significance. *Id.*

Pursuant to 20 C.F.R. §§ 404.1527(c) and 416.927(c), if a treating source's opinion is not accorded controlling weight, the ALJ should consider "all of the following factors" in order to determine the weight to be accorded to the medical opinion: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination, nature and extent of treatment relationship, and supportability; consistency with the record as a whole, specialization of the medical source; and other factors. *See also Johnson*, 434 F.3d at 654.

Social Security Ruling 96-2p specifically states:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating

source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.

The ALJ's decision must explain the weight accorded to all opinion evidence. 20 C.F.R. §§ 404.1527(e)(2)(ii) and 416.927(e)(2)(ii). In all unfavorable and partially favorable decisions and in fully favorable decisions based in part on treating sources' opinions, the ALJ must include the following:

> [T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight.

SSR 96-2p.

In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

However, several Circuits have held that "where there is no competing evidence, the ALJ is not permitted to substitute his opinions for those of the examining doctors." *Grecol v. Halter*, 46 Fed. Appx. 773 (6th Cir. 2002) (remanding the case for consideration of plaintiff's psychological condition where there was no evidence that plaintiff's examining doctor's opinion was incorrect); *see also Ness v. Sullivan*, 904 F.2d 432 (8th Cir. 1990) (finding that the ALJ erred by substituting his observation that plaintiff did not appear to be depressed or unhealthy during the hearing for the opinion of

plaintiff's doctor that plaintiff was suffering from depression); *Ramos v. Barnhart*, 60 Fed. Appx. 334, 336 (1st Cir. 2003) (concluding that the ALJ substituted his own lay opinion for the uncontroverted medical evidence where the ALJ concluded that plaintiff did not have an impairment that was diagnosed by two examining physicians and not rejected by any examining physician). While the Fourth Circuit has not directly stated this proposition, the court has reversed and remanded the case where the ALJ substituted his opinion for the uncontradicted opinion of an examining physician. *See Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984) (finding that the ALJ substituted expertise he did not possess in the field of orthopedic medicine for the opinion of an examining physician that was supported by the findings of a treating physician).

In view of the foregoing authorities, the court consider the ALJ's treatment of the opinions of Drs. Owens, Schwartz, and Tuggles.

a.    Dr. Owens's Opinion

On July 25, 2011, Dr. Owens completed a mental impairment questionnaire. Tr. at 409–14. He indicated that Plaintiff demonstrated the following signs and symptoms: appetite disturbance with weight change; decreased energy; blunt, flat, or inappropriate affect; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; emotional withdrawal or isolation and social avoidance; and sleep disturbance. Tr. at 410. He indicated that Plaintiff was unable to meet competitive standards with respect to the following: maintain attention for two hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; perform at a consistent pace without an unreasonable number and length of rest periods;

34

understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; maintain socially appropriate behavior; and travel in unfamiliar places.  Tr. at 411–12.  He indicated that Plaintiff would be seriously limited, but not precluded from the following: remember work-like procedures; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically-based symptoms; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards and take appropriate precautions; interact appropriately with the general public; and use public transportation.  Tr. at 411–12.  Dr. Owens indicated that Plaintiff had mild restriction of activities of daily living; marked difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation within a 12-month period, each of at least two weeks duration.  Tr. at 413.  He indicated that Plaintiff had a medically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration that had caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs attenuated by medication or psychosocial support and an anxiety-related disorder and complete inability to function independently outside the area of her

home.  *Id.*  Dr. Owens indicated that Plaintiff's impairments or treatment would cause her to be absent from work about three days per month.  Tr. at 414.

The ALJ assigned little weight to Dr. Owens's opinion.  Tr. at 39.  The ALJ noted that that in evaluating Dr. Owens's opinion, he considered the examining relationship, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with other evidence, and Dr. Owens's specialization.  *See* Tr. at 37–38.  He also noted that he considered the other factors described in 20 C.F.R. § 404.1527(d)(6) and that the opinion of a treating physician must be accorded "great weight" and cannot be disregarded without persuasive contradictory evidence.  Tr. at 38.  However, the ALJ concluded that there was "persuasive contradictory evidence" to refute Dr. Owens's opinion.  *Id.*  The ALJ noted that the record reflected that Dr. Owens provided medication management, not psychotherapy.  *Id.*  He also indicated that Plaintiff's daily activities and social functioning as related to Dr. Cole varied significantly from those described by Dr. Owens.  *Id.*  The ALJ also noted that Dr. Owens's opinion statement was internally inconsistent.  *Id.*  Finally, he recognized that Dr. Owens's treatment notes were largely illegible and could provide no evidence to support his opinion.  Tr. at 39.

The undersigned recommends a finding that the ALJ adequately considered Dr. Owens's opinion, specifically indicated the weight accorded to that opinion in accordance with SSR 96-2p, and considered all of the relevant factors set forth in 20 C.F.R. § 416.927(c) and *Johnson*.  The ALJ engaged in a lengthy discussion of Dr. Owens's opinion.  *See* Tr. at 37–39.  The ALJ specified that he accorded little weight to the

36

opinion.  Tr. at 39.  He provided valid reasons for concluding that Dr. Owens's opinion was not entitled to controlling weight because it was refuted by persuasive contradictory evidence.  *See* Tr. at 38.  Not only did the ALJ specifically note that he considered the criteria set forth in 20 C.F.R. 416.927(c) and *Johnson*, he provided a detailed account of how each factor was weighed.  *See* Tr. at 38–39.  Therefore, the undersigned recommends a finding that the ALJ adequately considered Dr. Owens's opinion.

b.    Dr. Schwartz's opinion

On November 22, 2010, Dr. Schwartz completed a check-off form in which he assessed Plaintiff's pain.  Tr. at 388–89.  He indicated that Plaintiff's pain was present to such an extent as to be distracting to adequate performance of daily activities or work.  Tr. at 388.  He indicated that physical activities, such as walking, standing, bending, stooping, moving extremities, etc., increased Plaintiff's pain greatly and to such a degree as to cause distraction from tasks or even total abandonment of tasks.  *Id.*  He indicated that Plaintiff had significant side effects from her medications that could be expected to limit the effectiveness of her work duties or her performance of everyday tasks.  *Id.*  He indicated that pain and/or drug side effects could be expected to be severe and to limit effectiveness due to distraction, inattentiveness, drowsiness, etc.  *Id.*  He indicated that pain treatment like those utilized for Plaintiff had been successful in similar cases, but that Plaintiff would still continue to have some pain.  *Id.*  Dr. Schwartz opined that Plaintiff would not be capable of performing sedentary work on a full time basis.  Tr. at 389. He indicated that Plaintiff would probably require frequent rest periods or

interruptions in work due to her medical condition.  *Id.*  However, he deferred to Dr. Owens regarding whether Plaintiff's restrictions were likely to be permanent.  *Id.*

On April 7, 2011, Dr. Schwartz completed a check-off form in which he indicated that he treated Plaintiff on referral from Dr. Tuggle secondary to Dr. Tuggle's diagnosis of fibromyalgia; that his diagnosis confirmed Dr. Tuggle's diagnosis of fibromyalgia in the presence of C3-4 fusion, cervical degenerative disc disease, bilateral S1 nerve-root irritation, sensory peripheral neuropathy, bilateral carpal tunnel syndrome, bilateral lower extremity venous reflux, and strains in the cervical spine, thoracic spine, and right posterior shoulder capsule; that he was aware that her sleep disorder and depression were being treated by other physicians; and that her fibromyalgia and other conditions impaired her ability to work so much that she was unable to work.  Tr. at 384–85.

In August 2011, Dr. Schwartz completed another check-off form in which he indicated that Plaintiff continued to be disabled as a result of fibromyalgia and back pain. Tr. at 442.

The ALJ specifically addressed Dr. Schwartz's opinions, indicated that he had considered the regulatory factors, and concluded that Dr. Schwartz's opinion was entitled to "light weight" instead of controlling weight because it was refuted by persuasive contradictory evidence.  Tr. at 40–41.  The ALJ indicated that Dr. Schwartz attributed Plaintiff's limitations to her psychological condition, but that he was a pain management specialist, not a psychologist or psychiatrist.  Tr. at 40.  The ALJ also indicated that Dr. Schwartz's opinion was inconsistent with the evidence as a whole, including his treatment notes, the observations of other physicians, and the results of clinical tests.  *Id.*

The ALJ specifically noted that Dr. Schwartz limited Plaintiff to lifting 20 pounds on September 15, 2010, and refused to authorize a handicapped parking permit for Plaintiff on October 3, 2011.  Tr. at 41.  He also noted that Plaintiff's pain was "managed;" that her physical examinations and diagnostic studies were generally normal; and that Dr. Schwartz's opinion conflicted with that of Dr. Barnes, an orthopedist.  *Id.*

The undersigned recommends a finding that the ALJ did not provide an adequate basis for failing to accord controlling weight to Dr. Schwartz's opinion.  Despite the fact that the ALJ addressed the opinion, indicated that he considered the regulatory factors, and provided reasons for giving "light weight" to the opinion, the ALJ's decision to not give controlling weight to the opinion is not supported by substantial evidence in the case record in accordance with SSR 96-2p.

While the ALJ indicated that Dr. Schwartz attributed Plaintiff's limitations to her psychological condition and that he did not have the specialization to assess her psychological condition, the undersigned's review of Dr. Schwartz's opinions reveals them to be assessments of the effects of pain and pain medications on Plaintiff's ability to function, which he was in the best position to address as her pain management physician.

Although the ALJ cited what he perceived as conflicts between Dr. Schwartz's opinion and his treatment notes, the undersigned's review of the record does not reveal any significant conflicts between Dr. Schwartz's treatment notes and his opinion.  The record reflects that Plaintiff saw Dr. Schwartz over 40 times between June 25, 2010, and February 14, 2012, which amounted to an average of more than twice a month.  On June 25, 2010, Dr. Schwartz noted numerous objective abnormalities on examination,

39

including positive Phalen's sign, marginally positive Spurling's sign, spasms, tenderness, decreased range of motion, edema, and decreased peripheral pulses. Tr. at 381–82. During the first year of treatment, Dr. Schwartz administered multiple diagnostic tests that yielded positive results. *See* Tr. at 349 (venous duplex), 351 (lower body sympathetic galvanic skin response test), 355 (upper body sympathetic galvanic skin response test), 357 (vascular Doppler duplex), 375 (venous duplex study), 375 (diagnostic musculoskeletal ultrasound), 377 (EMG), 498 (diagnostic musculoskeletal ultrasound). Throughout the course of treatment, Dr. Schwartz frequently noted edema in Plaintiff's lower extremities and tenderness in Plaintiff's spine and in her muscles and joints. *See* Tr. at 349, 353, 358, 493–95, 497, 499. Dr. Schwartz administered nerve blocks and epidural steroid injections to different parts of Plaintiff's body at nearly every visit. *See* Tr. at 349, 351–53, 355–56, 358, 363–64, 367, 371, 373, 375, 377, 492–99. While Plaintiff reported temporary relief to different areas at different times, she reported pain in some area at nearly every visit. *See* Tr. at 349, 352–53, 356, 358, 363, 367, 375, 381, 492–97, 499.

The undersigned's review of the record also fails to reveal inconsistencies between Dr. Schwartz's opinion and treatment notes and opinions or findings of any other treating or examining physician. Dr. Tuggle diagnosed Plaintiff with chronic pain syndrome, which is consistent with Dr. Schwartz's treatment of chronic pain. *See* Tr. at 318. Plaintiff complained of chronic pain to Drs. Tuggle, Owens, Bowers, and Barnes. *See* Tr. at 296, 298, 301, 305, 308, 312, 316, 318, 390, 433, 445, 448, 452, 503–05. Dr. Tuggle observed pitting edema in Plaintiff's lower extremities on several occasions. *See* Tr. at

40

297, 299, 302.  Dr. Nassif and his associate, Dr. Kulak, observed pitting edema, as well. *See* Tr. at 471, 477, 479.  Even the consultative physician Dr. Barnes noted crepitus and edema.  *See* Tr. at 492.  While the ALJ indicated that Dr. Schwartz's opinion was in contrast to the observations of Dr. Barnes, the undersigned notes that Dr. Barnes performed a one-time orthopedic examination, that he observed some of the abnormalities observed by Dr. Schwartz over the longitudinal period of treatment, and that he offered no opinion regarding the effects of pain on Plaintiff's ability to function. Therefore, Dr. Barnes's observations do not conflict with those of Dr. Schwartz or with his opinion statements.

As for the ALJ's conclusion that Dr. Schwartz's refusal to authorize a handicapped permit and the fact that he limited Plaintiff to a 20-pound lifting restriction conflicts with the opinions he rendered in this claim, the undersigned recognizes no conflict.  First, Dr. Schwartz indicated that he would limit Plaintiff to lifting no more than 20 pounds on September 15, 2010, which was less than two months after he started treating Plaintiff.  *See* Tr. at 364.  While he indicated that Plaintiff's pain was increased by physical activities, Dr. Schwartz did not offer specific indications as to how much physical activity Plaintiff could sustain in any of the opinion statements at issue. Furthermore, it seems that Dr. Schwartz addressed Plaintiff's pain, which he was in the best position to address, and declined to complete Plaintiff's application for a

handicapped placard because he was not in the best position to address her physical residual functional capacity and the permanency of her impairments.[3]

It appears that the ALJ substituted his opinion for the uncontroverted opinion of Plaintiff's treating physician in order to reach a conclusion that Plaintiff was not disabled. Based on rulings from the First, Sixth, and Eighth Circuit indicating that an ALJ cannot substitute his opinion for the uncontested opinion of a treating physician and based upon the Fourth Circuit's conclusion in *Wilson*, the undersigned recommends that the claim be remanded.

c.    Dr. Tuggle's Opinion

On February 24, 2011, Dr. Tuggle completed a medical questionnaire in which she indicated that she had seen and treated Plaintiff for edema, insomnia, fibromyalgia, and chronic back pain; that she first diagnosed Plaintiff with fibromyalgia on March 1, 2010; that she had continued to treat Plaintiff for fibromyalgia with Lyrica; that she was aware

---

[3] The South Carolina Department of Motor Vehicles's disabled placard and license plate application (Form RG-007A) requires a physician to indicate that the patient has one of the following conditions: an inability to ordinarily walk one hundred feet nonstop without aggravating an existing medical condition, including the increase of pain; an inability to ordinarily walk without the use of, or assistance from a brace, cane, crutch, another person, prosthetic device, wheelchair, or other assistive device; a restriction by lung disease to the extent that the person's forced expiratory volume for one second when measured by spirometry is less than one liter, or the arterial oxygen tension is less than sixty mm/hg on room air at rest; requires use of portable oxygen; a cardiac condition to the extent that the person's functional limitations are classified in severity as Class III or Class IV according to standards established by the American Heart Association; a substantial limitation in the ability to walk due to an arthritic, neurological, or orthopedic condition; and/or blindness. The physician must also certify whether the disability is permanent or temporary and if the physician indicates that the disability is temporary, he or she must provide an opinion as to how long the condition will last. South Carolina. Department of Motor Vehicles. DMV Forms and Manuals, N.p.: 2013. Web: www.scdmvonline.com/DMVNew/forms.aspx.

that Dr. Owens was treating Plaintiff for depression and sleep disorders with Cymbalta and Provigil; and that Plaintiff's fibromyalgia impaired her ability to work to the point that she was unable to work.  Tr. at 330.

On July 26, 2011, Dr. Tuggle completed another check-off form in which she indicated that she continued to endorse her February 24, 2011, opinion and that Plaintiff continued to be disabled as a result of fibromyalgia and back pain.  Tr. at 441.

The ALJ indicated the Dr. Tuggle's opinion was an opinion on an issue reserved to the Commissioner.  Tr. at 41.  He further indicated that her opinion was unpersuasive based on the following: her treatment notes often show she did no examination; her treatment notes are internally inconsistent; her area of medical specialty is family medicine, not rheumatology or orthopedics; she failed to document the requisite signs for fibromyalgia or to send Plaintiff to a rheumatologist for confirmation of the diagnosis; she failed to document the requisite signs for a diagnosis of RSD; she failed to refer Plaintiff to a counselor for depression; and her opinion was not supported by her own medical records or the longitudinal treatment record.  Tr. at 41–42.

The undersigned recommends a finding that Dr. Tuggle's opinions are opinions on issues reserved to the Commissioner and are not entitled to controlling weight.  Instead of setting forth specific limitations, Dr. Tuggle addressed Plaintiff's ability to work.

However, the undersigned recommends a finding that the ALJ did not adequately consider Dr. Tuggle's opinion based upon all of the criteria set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c).   The ALJ addressed the examining relationship, the treatment relationship, the nature and extent of the treatment relationship, Dr. Tuggle's

specialization as a family physician, and the supportability of the opinion with Dr. Tuggle's records. However, he summarily concluded that Dr. Tuggle's opinion was inconsistent with the record as a whole without explaining how it was inconsistent. *See* Tr. at 42. In fact, Dr. Tuggle's opinion was consistent with Dr. Schwartz's opinion and her findings were consistent with those of Drs. Schwartz, Nassif, Kulak, and Barnes, as discussed in greater detail above. Therefore, the ALJ did not adequately assess Dr. Tuggle's opinion as required by 20 C.F.R. §§ 404.1527(c) and 416.927(c).

3.     Credibility

Plaintiff argues that the ALJ erroneously disregarded her subjective complaints of pain because he found that there was no objective evidence to support her complaints. [Entry #23 at 10]. Plaintiff also argues that the ALJ erred in failing to consider her work history in his credibility determination. *Id.*

The Commissioner argues that the ALJ reached his conclusion regarding Plaintiff's credibility based on her activities of daily living, inconsistencies between her testimony and the record, and the lack of objective medical evidence to support the alleged severity of her impairments. [Entry #24 at 16]. The Commissioner submits that the ALJ's failure to discuss Plaintiff's work history was harmless error. *Id.*

SSR 96-7p provides the following guidance to ALJs tasked with assessing the credibility of claimants' statements:

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists about the symptoms and how they affect the individual, and

any other relevant evidence in the case record.  An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The provisions of 20 C.F.R. §§ 404.1529(c) and 416.929(c) set forth the following factors that the ALJ must consider in addition to the objective evidence when assessing a claimant's credibility:

1.     The individual's daily activities;
2.     The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.     Factors that precipitate or aggravate the symptoms;
4.     The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.     Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.     Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 or 20 minutes every hour, or sleeping on a board); and
7.     Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p.

The ALJ explicitly discussed Plaintiff's credibility, her complaints of pain, and the reason for his conclusion that Plaintiff was capable of performing "a wide range of light exertional work."  Tr. at 36–37.  He wrote the following:

> I specifically find that the claimant's subjective complaints regarding discomfort are not credible in establishing pain of a "disabling" nature as the record simply does not reveal any frequent, radicular, severely intense pain of a disabling character. Nor does the record indicate that the performance of sustained light exertional work activities would either precipitate or aggravate pain to a "disabling" degree.
>
> After considering the claimant's subjective complaints in view of pertinent Fourth Circuit caselaw and Social Security Ruling 95-5p, I do not find any medical condition which could reasonably be expected to cause the claimant "disabling" pain. Moreover, while I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

*Id.*

The undersigned recommends a finding that the ALJ failed to assess Plaintiff's credibility in accordance with SSR 96-7p. The undersigned concedes that the ALJ's decision was thorough and addressed each of the factors set forth in 20 C.F.R. §§ 404.1529(c) and 416.929(c). However, merely because the ALJ recited and addressed each of the factors set forth in 20 C.F.R. §§ 404.1529(c) and 416.929(c) does not mean that he considered them in determining Plaintiff's RFC. *See* SSR 96-7p.

While the ALJ indicated that he considered Plaintiff's statements about the intensity and persistence of her pain and the effect of her symptoms on her ability to work, it appears that the ALJ disregarded Plaintiff's statements based on the fact that he did not believe they were supported by the objective evidence. The ALJ's most telling statement is the following: "I do not find any medical condition which could reasonably be expected to cause the claimant 'disabling' pain." In *Thorne v. Weinberger*, 530 F.2d

580, 583 (4th Cir. 1976), the Fourth Circuit reversed the Commissioner's decision where the ALJ discounted the subjective evidence of pain because of weak objective findings. "Such evidence indicates the existence of disability, and when found to exist must be considered seriously." *Id. citing Baerga v. Richardson*, 500 F.2d 309, 313 (3rd Cir. 1971); *Brandon v. Gardner*, 377 F.2d 488, 490 (4th Cir. 1967). The decision read as a whole reveals that the ALJ concluded that because Plaintiff had no objective diagnosis that provided what he considered to be an acceptable explanation for her pain, he was disregarding Plaintiff's complaints of pain and her statements about her symptoms and their effect on her ability to work. SSR 96-7p expressly prohibits the ALJ from making such a finding.

The undersigned further notes that the ALJ's decision regarding Plaintiff's credibility is inconsistent with the evidence in the case record. Plaintiff testified to engaging in limited daily activities, which is not contradicted by the record. *See* Tr. at 65–85; *see also Higginbotham v. Califano*, 617 F.2d 1058, 1060 (4th Cir. 1980) ("The Secretary did not discharge his burden of proof that Higginbotham can do sedentary work by relying on the fact that she, at her own pace and in her own manner, can do her housework and shopping."). Plaintiff reported pain in multiple locations at nearly every medical appointment. *See* Tr. at 296, 298, 301, 305, 308, 312, 316, 318, 349, 352–53, 356, 358, 363, 367, 375, 381, 390, 433, 445, 448, 452, 492–97, 499, 503–05. She testified that she experienced pain. Tr. at 66–67. Plaintiff testified that her pain was aggravated by maintaining one position for too long, using her hands for longer than five or ten minutes, and engaging in physical exertion. Tr. at 80–81. She testified that she

took Oxycodone, Cymbalta, and Lyrica.  Tr. at 69.  The record reflects that Plaintiff received either a nerve block or an epidural steroid injection an average of twice a month between June 2010 and February 2012.  *See* Tr. at 349, 351–53, 355–56, 358, 363–64, 367, 371, 373, 375, 377, 492–99.  Plaintiff testified that she had to lie down every two hours for about 45 minutes.  Tr. at 79.  After citing much of the foregoing evidence, the ALJ concluded that Plaintiff was capable of performing a wide range of light exertional work.    The  undersigned  recommends  the  court  rule  that  the  ALJ's  finding  was inconsistent with SSR 96-7p.

The ALJ should also consider Plaintiff's work history on remand.

### 4. Evidence from Dr. Schwartz Submitted to Appeals Council

Plaintiff argues that the Appeals Council erred in failing to consider the opinions rendered by Dr. Schwartz on January 21, 2013, and February 8, 2013.  [Entry #23 at 11].

The  Commissioner  argues  that  the  evidence  submitted  was  neither  new  nor material.  [Entry #24 at 18–19].

In  light  of  the  undersigned's  recommendation  that  the  claim  be  remanded  for further proceedings, the undersigned assumes that this evidence will be considered upon remand.  Therefore, the undersigned deems it unnecessary to address this issue at this time.

### III. Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on  the  foregoing,  the  court  cannot  determine  that  the  Commissioner's  decision  is

supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

October 8, 2014                                                    Shiva V. Hodges
Columbia, South Carolina                              United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).